Insight Technology v. SureFire      CV-04-074-JD  08/09/04  P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Insight Technology Incorporated


    v.                                      Civil No. 04-74-JD
                                        Opinion No. 2004 DNH 120
SureFire, LLC


**REPORT AND RECOMMENDATION**


Plaintiff Insight Technology Incorporated ("Insight") is the owner of U.S. Patent No. 6,574,901 ("the '901 patent"), which is entitled "Auxiliary Device for a Weapon and Attachment Thereof." Insight filed a complaint in this court alleging that defendant SureFire, LLC ("SureFire") was infringing Insight's rights under the '901 patent by, among other things, making, using, selling and offering to sell weapon attachments that are covered by the '901 patent. Thereafter, Insight filed a motion for a preliminary injunction (document no. 10), which was referred to me for consideration and to prepare a report and recommendation. SureFire filed an objection. The court held an evidentiary hearing on the motion on July 14, 2004. For the reasons set forth herein, I recommend that Insight's motion be denied.

## Standard of Review[1]

Federal district courts are authorized to grant injunctive relief in patent cases under 35 U.S.C. § 283. Reebok Int'l v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994). The grant or denial of a preliminary injunction rests in the court's sound discretion. Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1364 (Fed. Cir. 2002). The Federal Circuit has cautioned that a preliminary injunction is a drastic and extraordinary remedy that ought not be routinely granted. Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993). A request for a preliminary injunction should be granted, however, if it is thoroughly justified. Polymer Techs. v. Bridwell, 103 F.3d 970, 977 (Fed. Cir. 1996).

"To obtain a preliminary injunction in the district court, the moving party must demonstrate a reasonable likelihood of success on the merits, irreparable harm in the absence of a preliminary injunction, a balance of hardships tipping in its favor, and the injunction's favorable impact on the public interest." Nat'l Steel Car, Ltd., v. Canadian Pac. Ry., Ltd.,

---

[1]Federal Circuit law provides the standards for determining whether a preliminary injunction should issue against patent infringement under 35 U.S.C. § 283. Hybritech Inc., v. Abbott Labs., 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

357 F.3d 1319, 1324-25 (Fed. Cir. 2004) (citing Jack Guttman, Inc. v. Kopykake Enters., 302 F.3d 1352, 1356 (Fed. Cir. 2002); Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)). The court must weigh and measure each preliminary injunction factor against the other factors and against the magnitude of the relief sought. Amazon.com, 239 F.3d at 1350 (citing Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988)). A movant is not entitled to a preliminary injunction if it cannot demonstrate a likelihood of success on the merits or irreparable harm. Nat'l Steel Car, 357 F.3d at 1325; Amazon.com, 239 F.3d at 1350.

To demonstrate a likelihood of success on the merits here, Insight must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) Insight will likely prove that SureFire infringes the '901 patent, and (2) Insight's infringement claim will likely withstand SureFire's challenges to validity, enforceability and non-infringement of the '901 patent. Amazon.com, 239 F.3d at 1350. "The burden is always on the movant to show entitlement to a preliminary injunction." Reebok, 32 F.3d at 1555. A preliminary injunction should not issue if the court finds that SureFire has raised a substantial question

3

concerning either infringement or validity that Insight cannot prove "lacks substantial merit."  Id.  The party opposing a preliminary injunction need not demonstrate clear and convincing proof in order to sufficiently raise a substantial question.  Nat'l Steel Car, 357 F.3d at 1335; Amazon.com, 239 F.3d at 1359.

Background

Insight is a New Hampshire corporation with a place of business in Londonderry, New Hampshire.  Insight's earliest products were aiming lights for U.S. military rifles.  Insight's success in that area led it to develop other weapon accessories for the military market, and to produce weapon accessories for the commercial market, including sales to U.S. law enforcement.

SureFire is a limited liability corporation with a principal place of business in Fountain Valley, California.  Since the 1980s, SureFire has dominated sales to the U.S. law enforcement market of lights that attach to weapons.

Glock Ges.m.b.H ("Glock Austria") and its U.S. subsidiary Glock, Inc. (collectively "Glock") are not parties to this action, but they are important participants in its background.  Glock is the leading supplier of pistols to the U.S. law enforcement market.

4

Kenneth Solinsky[2] testified at the hearing that Insight was contacted by Glock in the second half of 1996 after Glock saw an opportunity to sell flashlights that attached to its pistols to Austrian or German special forces. Glock was aware of Insight's work on a Universal Tactical Light for another firearms manufacturer, Heckler & Koch, and of Insight's work for the U.S. Government on Laser Aiming Modules ("LAM"). Glock was interested in having Insight develop a new white-light, rail-mounted illuminator for Glock pistols.

Solinsky testified that when Glock representatives met with Insight representatives Glock was already familiar with the use of open and closed rails on weapons to mount attachments. Solinsky testified that Insight suggested to Glock that open rails had advantages over closed rails because it would be easier to attach different devices to the weapon. Glock liked the idea of using open rails, but did not like Insight's proposal of attaching its Laser Aiming Module 2 ("LAM-2") to the rail secured by a thumbscrew through the trigger guard. According to Solinsky, Insight suggested to Glock that it add a cross slot to its design to prevent an attachment from sliding forward.

_____

[2]Solinsky is Insight's President and a company founder.

Several weeks later, Glock Austria stated in a letter to Christopher B. Edwards of Glock, Inc. that it wanted to use a standard Weaver rail, fixation of the device in the longitudinal axis by a notch rather than a thumbscrew, and a spring-tensioned clamp or clip. See Pl.'s Ex. 10. Edwards was asked to follow up with Insight on these design modifications and to obtain a price quote for 50 prototypes. Id.

Solinsky testified that when Insight received a drawing from Glock that included a cross slot, Insight observed that the cross slot was good, but that it was in the wrong location. Solinsky testified that Insight suggested that Glock move the cross slot further back on the pistol, which Glock did. Glock's eventual pistol frame design had open-ended rails mounted under the pistol barrel with a cross slot or transverse notch on the underside, forward of the trigger guard.

Insight's designers, Solinsky, Albert LePage and Wallace Woodman, subsequently developed a mechanism for attaching a tactical illuminator[3] to a weapon, which is the subject of the

---

[3]Solinsky testified that a tactical illuminator is basically a high performance flashlight.

'901 patent. Pl.'s Ex. 1.[4]  Insight refers to its attachment mechanism as the Slide-Lock™ mounting system. Insight introduced its first product having the Slide-Lock™ mounting system, the M3 Tactical Illuminator (the "M3"), in 1998. See Pl.'s Ex. 4.

SureFire received a letter from Glock in July 1997 indicating that Glock had completed development of its rail design, and requesting that SureFire develop prototype pistol accessories. Df.'s Ex. U. Glock's letter mentioned a number of features that Glock sought for a light attachment including: "easy ambidextrous use," and "easy/quick mounting on frame (click on solution - simple/quick removal)." Id.

John W. Matthews[5] testified that when he learned of Glock's proposal to use a notched, open rail with a "click-on" solution he immediately envisioned a spring-loaded mechanism known as a detent, which would force a bar or projection of some type into the notch on the rail. Detents are a commonly used engineering solution to fix the position of attachments. See Df.'s Ex. Z. Matthews testified that Paul Kim, SureFire's Vice President of Engineering, immediately came up with something similar to

---

[4]Exhibit citations refer to the exhibits introduced into evidence during the preliminary injunction hearing.

[5]Matthews is SureFire's President and a company founder.

Insight's M3 device after SureFire received a sample from Glock.

At his deposition, taken prior to the evidentiary hearing, Paul Kim testified that he and Matthews discussed how SureFire should approach developing a prototype for a light that would attach to a Glock pistol in response to the July 1997 letter and a sample that SureFire received from Glock.  Pl.'s Ex. 18 (Transcript of the Deposition of Paul Y. Kim dated June 10, 2004) at 14:13-23.  Kim thought that using a spring-loaded latching system was obvious for any typical rail glide system.  Id. at 15:11-22.  One of the initial designs that Kim contemplated was a T-shaped structure that Kim envisioned working with the Glock rail.  Id. at 17:12-18.  The mechanism would have a spring bias below wherein the user would "pull down and it would disengage, or if you let go it would engage."  Id. at 18:1-8.

The prototype that SureFire eventually developed had "two rail pieces parallel on the top side of the light, and in the middle there is a spring loaded piece which has a raised edge at one end and that raised edge interfaces with a notch on the underside of the gun."  Id. at 20:24-21-4.  Kim agreed that "the two pieces slide onto the rails onto the gun and then the spring loaded piece in the middle engages with the notch in the

8

underside of the gun." Id. at 21:5-8. Kim further agreed that there were two handles at the back of the light that were used to release the spring-loaded piece from the notch to remove the light from gun. Id. at 21:10-14. Following SureFire's receipt of Glock's proposal, SureFire developed its prototype into a commercial product that would attach on rails mounted on a Glock pistol. Id. at 38:25-39:16. SureFire did not see Insight's design until both SureFire and Insight displayed their prototypes at the same SHOT show in January or early February 1998.[6]

The evidence showed that another company, Wilcox Industries, independently developed a weapon attachment with an upwardly biased, spring-loaded bar or projection to fix its position to a Glock pistol. See Df.'s Ex. S (Transcript of the Deposition of Albert LePage, Jr. dated May 19, 2004) at 46:11-50:16, and Df.'s Ex. O. The Wilcox-designed device had two tabs that came out to compress the spring. Df.'s Ex. S at 47:8-12 and 47:21-48:2. Wilcox also displayed its device at the SHOT Show in early 1998.

Matthews testified that SureFire pulled its product, called the M110, off the market after learning of a malfunction with

---

[6]Alan T. Howe, Insight's Director of Commercial Business Development, testified that the SHOT (Shooting, Hunting and Outdoor Trade) Show is the largest consumer and commercial gun show in the United States.

Glock's product.  Matthews testified that Glock pistols are generally known for experiencing very few malfunctions.  SureFire's testing demonstrated that there was a problem with Glock's magazine that caused it to malfunction when it was used with the M110.  Matthews testified that SureFire's testing also showed that Glock pistols experienced firing malfunctions when used with Insight's product although there were fewer malfunctions because Insight's product was smaller.  SureFire's testing showed that the heavier the attachment, the higher the likelihood that were would be a malfunction.  Matthews testified that for purposes of officer safety, SureFire decided to cede the market to Insight and put out a warning that there was a possibility that there would be a malfunction problem if anything was mounted to a Glock rail.

According to Matthews, Glock later represented that it fixed the problem with its magazines.  SureFire now manufactures, markets, and sells the X200 Weapon Light (the "X200"), the accused device, which can be attached to a Glock pistol.  See Pl. Ex. 5.  SureFire began marketing the X200 in the fall of 2003, and began selling it in January 2004.  The X200 competes directly with Insight's M3.

Insight alleges that SureFire's X200 is a "knock off" of Insight's M3. Insight alleges that SureFire intentionally copied the M3 design after Insight's substantial efforts to turn the M3 into a commercial success began to bear fruit. Insight seeks a preliminary injunction to enjoin further sales of the X200 asserting that Insight will suffer irreparable harm in the form of lost goodwill and market share if SureFire continues to infringe the '901 patent.

SureFire denies Insight's allegation that the X200 is a knock off of the M3. Matthews testified that the X200 is an evolution in weapon light design that uses better technology, costs more to produce, and sells for a higher price than the M3. Paul Kim, the designer of the X200, admitted at his deposition that he saw the M3 before he designed the X200, but he testified that he did not refer to the M3 while working on X200 design.

In opposition to Insight's motion for injunctive relief, SureFire primarily argues that Insight is not likely to succeed on the merits because the '901 patent is invalid either because it was anticipated by the prior art, or because the subject matter was obvious to persons having ordinary skill in the art at the time the invention was made. Additionally, SureFire argues

that the '901 patent is unenforceable because Insight withheld relevant prior art from the patent examiner, and that even if the '901 patent is not invalid or unenforceable, the X200 does not infringe any claim of the '901 patent.

In the discussion that follows, the Court first considers Insight's infringement claim, and then considers SureFire's arguments that the '901 patent is either invalid or unenforceable.

Discussion

I.   Infringement

"Infringement analysis involves two steps: the court first construes the scope of the asserted claims and then compares the accused device to the properly construed claims to determine whether each and every limitation of a claim is present, either literally or equivalently, in the accused device."  Tate, 279 F.3d at 1365 (citing Amazon.com, 239 F.3d at 1351; Kahn v. GMC, 135 F.3d 1472, 1476 (Fed. Cir. 1998)).  Claim interpretation begins with the language of the claims.  Tate, 279 F.3d at 1370. This court "must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms."  Id.

12

(quoting <u>Johnson Worldwide Assocs. v. Zebco Corp.</u>, 175 F.3d 985, 989 (Fed. Cir. 1999) (additional citations omitted)).

For purposes of the motion for a preliminary injunction, Insight asserts that SureFire's X200 infringes claims 1, 10, 11, and 28 of the '901 patent. The Court next construes the asserted claims, and then compares those claims to the accused device.

A. <u>Claim 1</u>

The text of claim 1, with construed claim terms emphasized, is as follows:

1. An auxiliary device for use with a weapon, the auxiliary device comprising:

a housing:

at least one source of illumination located within the housing;

a first structural member extending upward from a first side of the housing and <u>extending along</u> at least a portion of the length of the first side of the housing;

a second structural member extending upward from a second side of the housing, wherein the second side of the housing is located opposite to the first side of the housing, and wherein the second structural member <u>extends along</u> at least a portion of a length of the second side of the housing such that it is substantially parallel to the first structural member, and wherein both the first and second structural members are substantially parallel to a central, longitudinal axis <u>extending along</u> a length of the housing; and

a spring-biased mechanism <u>extending across and along a top surface of the housing</u>, and wherein the spring-biased

13

mechanism is configured to be biased in a direction normal to the top surface of the housing.

'901 patent, col. 10, l. 49--col. 11, l. 2 (emphasis added). The Court is persuaded that Insight is likely to succeed in showing that every limitation of claim 1 is found in the X200.

There is no dispute that the X200 is an auxiliary device for use with a weapon. Consistent with claim 1 of the '901 patent, the X200 has a housing. The X200 housing meets the limitation of claim 1 that the housing have "at least one source of illumination located within the housing" because the X200 has a light-emitting diode ("LED") as an illumination source. The X200 meets the limitation of claim 1 of having two structural members that extend upward from and along opposite sides of the housing so that they are both substantially parallel to a central, longitudinal axis. The two parallel structural members of the X200 run along the top of the housing enabling it to slide onto rails on a weapon. The X200 further meets the limitation of having a spring-biased mechanism that extends across and along the top of the housing and is biased in a normal direction to the top of the housing. See Pl.'s Exs. 5, 14, and 15.

SureFire argues that Insight cannot establish a likelihood of success on the infringement issue because the X200 does not

14

have a spring-biased mechanism "extending across and along a top surface of the housing." See Df.'s Mem. In Opp. at 17. SureFire argues the term "along" should be read to require direct contact with the top surface of the housing. This is so, according to SureFire, because as used with regard to other aspects of the '901 patent, features that are described as "along" each other are in direct contact. SureFire further argues that since the spring-biased plate on the X200 pivots about a pin near the back of the unit, and the free end of the plate is supported by the spring, the spring-biased mechanism does not come into direct contact with the housing. Therefore, according to SureFire, the X200 does not literally infringe the '901 patent.

Insight replies that SureFire does not deny that the X200 has a spring-biased plate that rests above and largely covers the length of the top surface of its housing, which is consistent with the ordinary meaning of "along."[7] Insight argues that

_____

[7]In support of its reply, Insight cites The American Heritage® Dictionary of the English Language (4th ed. 2000) (first definition of "along": "Over the length of: walked along the path"; second definition of "along": "On a line or course parallel and close to; continuously beside: rowed along the shore; the trees along the avenue."). The Court further notes the similar definitions of "along" in Webster's Third New International Dictionary 60 (1993) (first definition of "along": "over the length of (a surface)"; second definition (entry 2a): "in a line parallel with the length or direction.").

15

SureFire's preferred construction of the claim term "along" as meaning "in direct contact" should not be adopted by this court because it is contrary to the ordinary and accustomed meaning of the term and is not found in any dictionary. The Court agrees.

SureFire has not pointed to any evidence that Insight chose to become its "own lexicographer by clearly and explicitly defining the claim term," nor that the claim term "along" is devoid of clarity such that there is "no means by which the scope of the claim may be ascertained from the language used." Tate, 279 F.3d at 1370 (citing Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001) (additional citation omitted)). Therefore, SureFire has not overcome the strong presumption in favor of adopting the ordinary meaning of claim language. Tate, 279 F.3d 1370.

Insight further argues that SureFire's construction of the term "along" is incorrect because it would exclude not only the X200, but also the preferred embodiment of the invention claimed in the '901 patent because, as shown in Figure 6 of the patent, there is a gap between the spring-biased mechanism and the top surface of the housing. See NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is

16

elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support.'"). SureFire did not rebut this argument.

The Court finds that Insight has sufficiently demonstrated that SureFire's non-infringement argument lacks substantial merit. Accordingly, the Court finds that Insight is likely to succeed in demonstrating that every limitation of claim 1, or its equivalent, may be found in the X200.

B. Claims 10, 11 and 28

The text of claims 10, 11 and 28 is as follows:

10. The auxiliary device of claim 1, wherein the spring-biased mechanism comprises a positioning member.

11. The auxiliary device of claim 10, wherein the positioning is in the form of a spring-loaded bar.

28. The auxiliary device of claim 1, where in the spring-biased mechanism includes a portion, which upon manipulation by a user, overcomes the bias provided by the spring-biased mechanism.

'901 patent, col. 11, ll. 27-39--col. 12, ll. 25-28.

For purposes of the motion for a preliminary injunction, SureFire has not argued that the X200 does not have the limitations of claims 10, 11 and 28. See Df.'s Mem. In Opp. at 17-18. Based on the Court's review of Solinsky's testimony at

17

the evidentiary hearing and the exhibits (see Pl.'s Exs. 4, 5, 14 and 15), the Court finds that Insight is likely to succeed in demonstrating that each claim limitation, or its equivalent, of claims 10, 11, and 28 may be found in the X200.

II. Patent Validity

Under 35 U.S.C. § 282, a patent is presumed valid. "[T]his presumption exists at every stage of the litigation." Canon Computer Sys. v. Nu-Kote Int'l, 134 F.3d 1085, 1088 (Fed. Cir. 1998) (citations omitted). The party asserting that a patent, or any claim thereof, is invalid has the burden of establishing invalidity. 35 U.S.C. § 282. The statutory presumption of validity, however, does not relieve the patentee of its obligation to demonstrate likelihood of success at trial on the validity issue where the opposing party identifies persuasive evidence of invalidity. Canon, 134 F.3d at 1088; Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339-40 (Fed. Cir. 2003).

A. Obviousness of Invention

A patent should not issue "if the differences between the [claimed invention] and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."

18

35 U.S.C. § 103(a). The obviousness determination is a legal conclusion based on factual evidence. <u>Tec Air, Inc. v. Denso Mfg. Mich. Inc.</u>, 192 F.3d 1353, 1359 (Fed. Cir. 1999).

In order to establish a <u>prima</u> <u>facie</u> case of obviousness, SureFire is required to show "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references." <u>Tec Air</u>, 192 F.3d at 1359 (quoting <u>In re Fine</u>, 837 F.2d 1071, 1074 (Fed. Cir. 1988)). A motivation to combine may also flow from the nature of the problem to solved. <u>Pro-Mold & Tool Co. v. Great Lakes Plastics</u>, 75 F.3d 1568, 1573 (Fed. Cir. 1996) (citing <u>In re Rinehart</u>, 531 F.2d 1048, 1054 (C.C.P.A. 1976)).

"A determination of obviousness must involve more than indiscriminately combining prior art." <u>Micro Chem., Inc. v. Great Plains Chem. Co.</u>, 103 F.3d 1538, 1546 (Fed. Cir. 1997). To avoid impermissible hindsight-based obviousness analysis, the court must rigorously apply the requirement for a showing of a teaching or motivation to combine prior art references. <u>See Ecolochem, Inc. v. Southern Cal. Edison Co.</u>, 227 F.3d 1361, 1372 (Fed. Cir. 2000) (citing <u>In re Dembiczak</u>, 175 F.3d 994, 999 (Fed.

19

Cir. 1999), abrogated on other grounds by In re Gartside, 203 F.3d 1305 (Fed. Cir. 2000)); see also Amazon.com, 239 F.3d at 1364 (the relevant inquiry on obviousness is "what a hypothetical ordinarily skilled artisan would have gleaned from the cited references" at the time that the patent application was filed). The determination of what a prior art reference teaches is a question of fact. Amazon, 239 F.3d at 1358. "There is no suggestion to combine . . . if a reference teaches away from its combination with another source." Tec Air, 192 F.3d at 1360. A reference teaches away if when upon reading the reference a person of ordinary skill "would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant . . . [or] if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." Id. (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).

A prima facie case of obviousness may be rebutted by objective evidence of non-obviousness. Tec Air, 192 F.3d at 1360. Such evidence includes commercial success of the invention and a showing of a long-felt unsolved need. Id. "Whether the

20

evidence presented suffices to rebut the prima facie case is part of the ultimate conclusion of obviousness and is therefore a question of law." Id. (quoting In re Rouffet, 149 F.3d 1350, 1355 (Fed. Cir. 1998)).

### 1. Evidence of Obviousness

#### a. Objective Teaching in the Prior Art

SureFire argues that there are multiple prior art references establishing the invention claimed in the '901 patent. SureFire cites (1) the SUSAT[8] universal mount; (2) information provided in correspondence and accompanying diagrams from Glock Austria and Glock, Inc. to Insight between May 14 and June 10, 1997 ("the Glock documents"); (3) Insight's SOCOM LAM; (4) U.S. Patent No. 5,685,105 ("the '105 patent"); and (5) U.S. Patent No. 4,825,744 ("the '744 patent"). SureFire argues that these five prior art references can be combined in a variety of ways to demonstrate obviousness. SureFire further argues that Glock provided the motivation and suggestion to combine the identified references by defining the problem as one of fixing the position of a light on a pistol with a notched, open rail, so that the attachment will easily click on and off.

---

[8]SUSAT stands for Sight Universal Small Arms Trilux. Df.'s Ex. X.

21

### i. SUSAT Mounting System

The first prior art reference SureFire cites is the SUSAT rifle scope developed by United Scientific Instruments, Ltd. ("USI"). See Df.'s Ex. W. SureFire offers hearsay evidence that the SUSAT uses a "universal mount" to attach to a standard "Picatinny" rail using a spring-loaded plunger with a transverse bar on the end. Id. The transverse bar engages a notch on the mounting rail. Id. According to an individual identified as M.I. Cooper, the SUSAT mounting system was designed in the early 1980s and was demonstrated in the United States at a military base in the mid-1980s. Id. SureFire contends that not only does the SUSAT teach the invention of the '901 patent, it also anticipates every element of claims 1, 10, 11, and 28.

In response, Insight first argues that SureFire's evidence concerning the SUSAT is inadmissible. Second, Insight argues that, even if SureFire's evidence is admissible, it does not establish that the SUSAT is prior art. Third, Insight argues that SureFire's evidence does not demonstrate that the particular SUSAT design it claims was anticipatory was used in the U.S. in the mid-1980s. Fourth, Insight argues that even if the particular version of the SUSAT on which SureFire relies was

22

publicly used in the U.S., it fails to meet multiple limitations of the asserted claims, and thus does not anticipate them. And fifth, Insight argues that the SUSAT has no "source of illumination," because it is a scope not an illuminator.

Although the Court overruled Insight's objection to SureFire's evidence pertaining to the SUSAT device,[9] the Court finds the weight of that evidence is limited. Furthermore, based on the Court's review of the evidence, the Court agrees with Insight's argument that there are a number of differences between the SUSAT and claims 1, 10, 11 and 28 of the '901 patent. Contrary to the asserted claims, the SUSAT's structural members that glide onto rails extend downward from the housing not upward. The SUSAT's structural members also do not extend from a side of the housing, but rather are on a separate piece called a "universal mount." The universal mount is in turn attached to the SUSAT and to the weapon. Furthermore, the SUSAT's spring-biased mechanism is located on the bottom surface of the

---

[9]The Court overruled Insight's hearsay objection based on the relaxed evidentiary standard used in preliminary injunction hearings. See Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986) (finding that hearsay materials may be received in preliminary injunction proceedings if the court finds that the evidence is appropriate given the character and objectives of the injunctive proceeding).

universal mount, not the top surface of the SUSAT's housing.  And the SUSAT does not have a source of illumination -- meaning "a device generally devised to cast light upon a target area or a portion thereof" -- as described in the '901 patent.  See Pl. Ex. 1 at col. 6, lines 8-9.  Because of the limited weight given to SureFire's evidence pertaining to the SUSAT mounting system, and because the evidence does not fully disclose all of the elements of the asserted claims, the Court finds that SureFire has not raised a substantial question that the SUSAT anticipates claims 1, 10, 11 and 28 of the '901 patent.

Despite the identified differences between the asserted claims and the features of the SUSAT, the Court nonetheless finds that there are substantial similarities between them, namely attachment of the device to a standard weapon rail, the use of a spring-biased mechanism (a plunger) with a transverse bar, and engagement of the transverse bar with a notch on the mounting rail.  The Court finds that these teachings of the SUSAT are relevant in determining whether, in combination with other prior art references, the asserted claims were obvious to a person having ordinary skill in the art at the time that the application for the '901 patent was filed.

### ii. Glock Documents

SureFire argues that the information in the Glock documents shows that Glock Austria conceived of attaching a light to its pistols using a spring-tensioned clip fitted into a notch on the underside of a standard rail prior to May 17, 1997. See Df.'s Ex. D-G. Insight responds that all the Glock documents show is a pistol with a standard set of rails with a transverse slot across them. Thus, Insight argues, Glock did not disclose or describe any specific auxiliary device.

Insight further argues that the Glock documents actually teach away from the claimed invention in that Glock advised that "we need/prefer a clamp/clip" to fix the device on the weapon. The evidence showed that the "clamp" feature suggested by Glock referred to an attachment mechanism that is different from the claimed invention. Paul Kim acknowledged in his testimony that a lateral clamp mechanism provides a "click-on solution" and allows "easy and quick" mounting of a light to a gun with rails. Pl.'s Ex. 18 at 35:19-36:11. Kim further testified that there were many different ways that could have been used to attach a device to Glock's pistol once they added rails with a cross slot. Id. at 109:22-113:15. Based on a review of the evidence, the Court

agrees with Insight's conclusion that the Glock documents did not dictate Insight's invention.

The evidence shows, however, that Glock presented the problem of developing a light to attach to rails mounted on the underside of its pistols to Insight and others, including SureFire.  In so doing, Glock presented a motivation to companies producing complementary products to search for a solution. Although Glock representatives did indicate that "we need/prefer a clamp/clip" to fix the device on the weapon, the evidence shows that Glock prompted vendors to be creative, and affirmatively ruled out only Insight's proposal to the use of a thumbscrew or fixation wheel as a means of fixing the device to the weapon. See Df.'s Ex. D & F.  The Glock documents are relevant in determining the issue of whether the claims asserted in the '901 patent were obvious in that Glock provided a motivation to persons of ordinary skill in the art to solve the problem of designing a rail-mounted light for its pistols.  Having settled on a pistol design with a standard rail and a transverse notch or cross slot forward of the trigger guard, Insight, SureFire and others had a motivation to combine the relevant teaching of the prior art to develop the best solution for Glock.

26

### iii. <u>Insight's SOCOM LAM Battery Pack</u>

In or about 1992, Insight developed a new battery pack designed to slide onto rails on the bottom of its LAM. Df.'s Ex. P (Transcript of the Deposition of Wallace E. Woodman, III dated May 20, 2004) at 88:5-96:7. Approximately thirty of these battery packs were produced and sold to the U.S. military unit known as SOCOM. <u>Id.</u>; <u>see also</u>, Df.'s Ex. Q (Transcript of the Deposition of Kenneth Solinsky dated May 20, 2004) at 87:1-91:13. Although acknowledging that the SOCOM LAM did not have a "source of illumination located within the housing," SureFire argues that the SOCOM LAM disclosed all of the other elements of claims 1, 10, 11 and 28 of the '901 patent.

Insight responds that the SOCOM LAM is only relevant in that it contains an attachment of a battery pack to a LAM that is in turn screwed onto a gun. Insight argues that attaching a battery pack to an auxiliary device presents a far different problem than attaching an auxiliary device directly to a gun. Therefore, Insight argues that the SOCOM LAM cannot be considered highly relevant prior art as SureFire contends. This argument has some force. That the SOCOM LAM battery pack is not itself an auxiliary device that attaches to a weapon greatly limits its

persuasive value. The Court finds that SureFire has not presented a credible argument that persons of ordinary skill in the art had a motivation to combine the teachings of the SOCOM LAM battery pack in combination with other prior art references rendering the asserted claims obvious.

iv.  The '105 patent

SureFire argues that the '105 patent discloses a flashlight that attaches to the underside of the barrel of a pistol via a rail. The flashlight is locked into position on the rail by a spring-loaded pin, rather than a bar or projection, that clicks into a hole in the frame. To remove the flashlight, a lever is depressed that compresses the spring and thus pulls the pin out of the positioning hole. The spring-loaded pin is biased upward from the housing of the light. SureFire argues that the '105 patent includes every element of claims 1, 10, 11 and 28 of the '901 patent except the requirement in claim 1 that the spring-biased mechanism extend "across" a top surface of the housing.

Insight responds that the evidence shows that the patent examiner considered the invention disclosed in the '105 patent and simply did not deem that reference material enough to apply it against the '901 patent claims. Therefore, the '105 patent is

28

not persuasive evidence supporting a finding of obviousness.

In further support of its non-obviousness argument, Insight argues that SureFire provides no reason why Glock's gun would not be modified to use the '105 patent's spring-loaded pin, rather than abandoning that technique. Nor has SureFire explained why a spring-loaded bar would be adopted rather than some other mechanism such as the side clamping mechanism suggested by Glock.

Neither party has presented evidence pertaining to the relative advantages or disadvantages, from a mechanical engineering standpoint, of using a spring-loaded pin in contrast to a spring-loaded bar or projection, or of using a positioning hole in contrast to a transverse cross slot or notch. And the patent examiner certainly did not find that the '105 patent rendered the claims in the '901 patent obvious. However, the Court finds that the '105 patent is relevant prior art in that it teaches the use of a spring-biased mechanism in conjunction with a positioning member to fix the position of a weapon attachment. Therefore, the Court considers the '105 patent in weighing the evidence on SureFire's obviousness claim.

### v. The '744 patent

The '744 patent discloses a mechanism on a pistol for fixing

the gun's slide and barrel in a predetermined position on the frame. It discloses the use of a spring-biased bar that presses up into a notch in the barrel to lock a gun's slide and barrel in place, and a release that compresses the spring so the slide and barrel can be removed. SureFire argues that the '744 is closely analogous prior art suggesting the use of a spring-biased position fixing mechanism with a bar that fits into a notch on a pistol.

Insight responds that the '744 patent has nothing to do with attaching a device to a gun. Rather, as SureFire acknowledges, the '744 patent "discloses a mechanism on a pistol for fixing the gun's slide and barrel in a predetermined position." If the '744 patent were combined with the Glock documents it would not have resulted in attaching any device to Glock's guns, and therefore could not be interpreted as suggesting the particular manner of Insight's invention. As with Insight's argument pertaining to the value of the evidence pertaining to the SOCOM LAM battery pack, that the '744 patent does not pertain to an auxiliary device that attaches to a weapon renders it of little persuasive value in the Court's obviousness analysis.

Considering each of the five identified prior art

30

references, the Court is not persuaded that the prior art teaches the invention in the asserted claims. The Court does find, however, that the Glock documents provided a motivation to combine the relevant teachings of the SUSAT and the '105 patent in developing an acceptable solution for Glock. The Court continues the obviousness inquiry by considering knowledge generally available to those of ordinary skill in the art.

b. Knowledge Generally Available

Apart from showing objective teachings in the prior art, SureFire can establish a prima facie case of obviousness if it can show "that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the [prior art] references." Tec Air, 192 F.3d at 1359. The parties agree that standard Weaver or Picatinny weapon rails with transverse slots or notches have been used for decades. The evidence further showed that the use of a detent is a common engineering solution to the problem of fixing two objects together. See Df.'s Ex. Z. SureFire argues that because the market for weapon attachments is driven primarily by the desires of firearms manufacturers there was simply no motivation to develop a design for a pistol such as that claimed

31

by Insight in the '901 patent prior to Glock's request to vendors. Once that motivation was provided, SureFire argues, the invention claimed by Insight was obvious. In light of the relevant teachings from the prior art discussed above, and the knowledge generally available pertaining to the use of spring-biased mechanisms, the Court finds that SureFire has presented at least a prima facie case of obviousness with regard to the asserted claims. The Court considers the evidence on secondary considerations in the obviousness inquiry next.

### 2. Secondary Indicators of Non-obviousness

Secondary indicators of non-obviousness include commercial success, long felt but unsolved needs, failure of others to make the invention, whether there was simultaneous invention, and whether there is evidence of copying and acclamation. Ecolochem, 227 F.3d at 1376-1380. The court weighs all of the secondary considerations to determine whether the evidence supports the conclusion that the asserted claims were obvious.

### a. Commercial Success

Insight contends that the commercial success of Insight's Slide-Lock™ devices in the marketplace is strong evidence of non-obviousness. The evidence shows that Insight's sales of Slide-

Lock™ devices grew nine times from 1999 to 2003, and that Insight projects that its 2004 sales will represent an increase of more than 40% in comparison with 2003 sales. See Pl.'s Exs. 2-3.[10] Insight argues that this evidence entitles it to a presumption that its patented invention is commercially successful. See Ecolochem, 227 F.3d at 1377 (a showing of significant sales in a relevant market, and that the successful product is the invention disclosed in the patent, supports a finding that the patented invention is commercially successful).

SureFire argues in response that the commercial success of Insight's products is not an indicator of non-obviousness because Insight's products were successful only because there were no viable competing products after SureFire voluntarily withdrew from the market. SureFire further argues that because Insight's

---

[10]Insight's Alan Howe identified a number of factors that he believed contributed to the success of Insight's Slide-Lock™ devices in the marketplace including: (1) increased presence with key distributors; (2) appreciation by end users of the compact overall size and weight of Insight's product; (3) appreciation by end users of the ambidextrous access to the switch; (4) the maturity of Insight's advertising campaign; and (5) the number of guns with which the products could be used. Howe testified that the unique attachment mechanism of Insight's Slide-Lock™ devices gave it a means to distinguish itself from SureFire, and to overcome the brand loyalty that SureFire had developed as the dominant player in the U.S. law enforcement market.

success was attributable in part to more firearms being manufactured that could accommodate Insight's design the court should find that there is not a sufficient nexus between the commercial success of Insight's products and the patented invention. The Court disagrees.

Considering evidence presented at the hearing, the Court is persuaded that Insight's products were a commercial success due primarily to Insight's efforts to make potential customers familiar with its patented attachment mechanism. Accordingly, the Court finds that the commercial success factor weighs in Insight's favor on the obviousness issue.

### b. Long-felt But Unsolved Needs

Matthews testified that the market for weapon attachments has largely been dictated by the desires of firearms manufacturers. The evidence shows that when Glock presented the problem of how to attach a tactical light to an open rail with a notch or transverse cross slot that three companies, Insight, SureFire, and Wilcox, developed solutions in the same time frame incorporating similar design features. Accordingly, the Court finds that the evidence does not support a finding that a long-felt, but unsolved need, existed.

34

c. <u>Failure of Others to Make Invention</u>

There was no evidence presented at the hearing of unsuccessful attempts by others to make the invention claimed in the '901 patent. Therefore, the Court does not find that this factor supports a finding of non-obviousness.

d. <u>Simultaneous Invention</u>

Matthews testified that when SureFire received the drawing from Glock depicting a pistol design with open rails and a cross slot he thought that using a detent was an obvious solution. The device designed by SureFire's Paul Kim had a spring-loaded bar similar to Insight's M3. In developing its products, SureFire did not have access to Insight's products or Insight's development process. SureFire developed and sold the M110, and a device it called the P110, before the '901 patent issued. During the hearing, Matthews opined that because of the similarity in the functions employed if the X200 infringes the '901 patent then so did the M110.

The evidence further showed that Wilcox Industries independently developed a device with structural members that attached to rails, and an upwardly biased, spring-loaded bar or projection to fix its position to a Glock Pistol. The device

35

also had two little tabs that came out to compress the spring. These are features that, if proven, would likely infringe the asserted claims of the '901 patent. Wilcox presented its product at the same SHOT Show where Insight and SureFire first displayed their products.

"The fact of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art." Ecolochem, 227 F.3d at 1379 (quoting Int'l Glass Co. v. United States, 408 F.2d 395, 405 (1969)); see also, Stewart-Warner Corp. v. City of Pontiac, Mich., 767 F.2d 1563, 1570 (Fed. Cir. 1985) (development by others may be pertinent to a determination of obviousness of an invention where the evidence presented is of activities occurring prior to the filing of the patentee's patent application). The court must determine whether near simultaneous invention by two or more equally talented inventors working independently is an indication of obviousness in light of all the circumstances. Ecolochem, 227 F.3d at 1379.

SureFire argues that the conclusion that the claims asserted by Insight in this litigation were obvious is strongly supported by the results of three companies working independently on a

problem simultaneously developing similar solutions. Each company apparently produced a weapon attachment that uses a spring-biased mechanism that puts a projection up into a cross slot. Furthermore, each device had parallel structural members that slid onto open rails on a Glock pistol. SureFire asserts that there is an open question as to which entity came up with the design first. The Court finds this argument persuasive.

Insight has no answer to SureFire's simultaneous invention argument. Insight suggested during the hearing that Glock may have provided information about Insight's design to SureFire and Wilcox prior to the SHOT Show in early 1998. SureFire disputes this suggestion, and no evidence was offered supporting Insight's supposition.

### e. Copying and Acclamation

SureFire denies that it copied Insight's M3 design. It asserts that SureFire developed its own spring-biased mechanism for the M110 in 1997 simultaneously and independently of Insight. SureFire further asserts that the X200 represents an evolution in weapon light design that is based on advances in technology. Apart from Insight's allegations in this action, Insight has not presented evidence that others have copied its design. Moreover,

37

Insight has not offered evidence that there has been public acclamation for the M3. The Court finds that the copying and acclamation factors do not support a finding of non-obviousness.

### 3. Weighing of the Factors

Based on the evidence presented during the hearing, the Court finds that SureFire has raised a substantial question that the claims in the '901 patent asserted by Insight were obvious. In particular, the Court is most persuaded by the evidence of Glock providing a motivation to combine the teachings of relevant prior art references, knowledge generally available about the use of spring-biased mechanisms to fix objects in combination with rails, and the strong evidence of near simultaneous invention by three companies. The Court finds that Insight has not demonstrated that SureFire's obviousness argument lacks substantial merit.

### B. Anticipation By Prior Art

For the reasons set forth above in discussing the differences between the SUSAT and the asserted claims, the Court finds that SureFire has not raised a substantial question regarding the validity of the '901 patent due to anticipation by the SUSAT.

III. Inequitable Conduct During Prosecution

In addition to arguing that the '901 patent is invalid, SureFire argues that Insight's patent is likely unenforceable. Having reviewed the evidence, the Court is not persuaded that SureFire has demonstrated that Glock Austria conceived of all of the key features of the invention claimed in the '901 patent. The documents produced by Glock show a pistol with a standard set of rails with a transverse notch or cross slot. Although Glock did express a preference for a spring-tensioned clamp or clip with regard to lateral fixation of the device, Pl.'s Ex. 10, there is no evidence that Glock disclosed or described the auxiliary device that Insight claimed in the '901 patent.

The Court further finds conclusory and unpersuasive SureFire's argument that Insight intentionally failed to disclose the SOCOM LAM battery pack and the Glock Documents, which, according to SureFire, a reasonable patent examiner would consider "critically important" in deciding whether to allow the '901 patent. Accordingly, the Court does not find that SureFire has raised a substantial question that the '901 patent is likely unenforceable.

The Court finds that Insight has not demonstrated that it is likely to succeed on the merits because SureFire has raised a substantial question as to whether the asserted claims were obvious. Accordingly, the Court need not consider the remaining preliminary injunction factors. See Reebok, 32 F.3d at 1556.

Conclusion

For the reason set forth above, I recommend that Insight's motion for a preliminary injunction (document no. 10) be denied.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date: August 9, 2004

cc:  Daniel E. Will, Esq.
     Lawrence K. Kolodney, Esq.
     Gary A. Clark, Esq.
     Jennifer Rood, Esq.
     Jonathan Hangartner, Esq.
     Laura L. Carroll, Esq.